IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HOUSTON DIE CASTING COMPANY, | ) | CASE NO. 1:03CV1033 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| EATON CORPORATION, | ) | **DEFENDANT EATON TRIAL BRIEF** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to this Court's Trial Order, Defendant Eaton Corporation ("Eaton") respectfully submits the following trial brief.

A.  Statement of Facts

Defendant's position in this litigation is based on the unremarkable notion that a party (whether an individual or a corporation) is entitled to get what it pays for, and that when it does not it is entitled to some remedy. In this case, during negotiations regarding the terms of the Sourcing Agreement and in the express language of the Agreement itself, Eaton was promised that it could rely on Plaintiff Houston Die Casting Company ("HDC") to produce quality parts and to serve as a replacement supplier.

Instead, Eaton received inferior parts, little cooperation in resolving quality concerns, no direction from Plaintiff on how it planned to improve its performance, and a series of excuses and accusations. In this context, it was reasonable and appropriate for Eaton to terminate the Sourcing Agreement.

*1.     Negotiation of Contract*

Eaton is a manufacturing company, dealing primarily in fluid power, industrial and commercial controls, and automotive and truck components. HDC is a Texas corporation engaged primarily in the manufacture and sale of castings, machining, impregnation, and related products and services.

Parties began to negotiate the terms of the Sourcing Agreement in mid 1999. In June of that year, Eaton visited Plaintiff's facility.

Eaton was concerned about Plaintiff's production capacity. HDC's facilities were not up-to-date and it did not have extensive experience with machining complicated parts. In addition, Eaton auditors did not see evidence of any modern system for monitoring production quality or measuring performance. Plaintiff assured Eaton that it would be able to improve production and would be willing to purchase new equipment and hire additional personnel to make it a more attractive supplier.

Plaintiff intended to sell itself aggressively to Eaton. It believed that it would be able to use Eaton's name and reputation for quality as a selling point in marketing itself to other die casting customers and would generally increase Plaintiff's market presence.

In negotiating the terms of the relationship, Eaton was particularly concerned that HDC had little experience with machining complicated parts and lacked modern systems for monitoring quality. Eaton made it clear that it was not equipped to be involved in resolving quality issues in another country and was not willing to take on that responsibility. During negotiations, it was decided that Plaintiff should hire a dedicated project manager to measure Plaintiff's performance and monitor quality control issues. Eaton also required that a third party be used to further monitor quality and to assist in resolving any problems.

To further address these concerns, HDC suggested that it acquire the new machining equipment it would need on a "turn key" basis. Under this type of relationship, the equipment manufacturer (OKUMA) was not only responsible for providing equipment but also for providing additional support services to make sure the equipment was working properly.

2. *Terms of Contract*

Based on these negotiations, on March 31, 2000, parties signed a Sourcing Agreement to govern their relationship. In relevant part, the contract required that:

> ¶3.2 Marketwise (the third-party broker which had assisted parties in negotiating the Agreement and which would be paid by Plaintiff) was responsible for quality assurance and inspection of parts.
> ¶6.1 Time was understood to the of the essence in the delivery of parts, and Plaintiff agreed to deliver parts on basis that would allow Eaton to meet its production requirements.
> ¶6.2 Plaintiff was to hire a dedicated project manager to manage the start-up of production and to control the project during its first year and whenever substantial new business is added.
> ¶6.3 Plaintiff was to produce castings on existing die cast equipment. Okuma, through its Mexican distributor HEMAQ, was to supply CNC equipment for machining the parts.
> ¶7.2 Plaintiff agreed to provide parts that would meet Eaton's Supplier Performance Standard and other specifications.
> ¶8.2 Plaintiff warranted that the part supplied would be of merchantable quality, free from defects, and fit for Eaton's purposes.
> ¶10.1 Plaintiff agreed to return upon request all Eaton's equipment, tooling, or other materials.
> ¶10.2 Plaintiff has the obligation of acquiring tooling as needed to perform under the Agreement.

The Agreement between the parties therefore expressly anticipated that Eaton may need to request return of its tooling and equipment, required that Plaintiff produce parts of sufficient quality to meet Eaton's specifications, and placed the burden for monitoring quality issues on Plaintiff (either through its dedicated project manager, or through its agent Marketwise).

On April 9, 2000, parties met in Hutchinson, Kansas, to further define the terms of the relationship. At this meeting, Plaintiff was reminded that it would need to meet Eaton

specifications and standards. It was also expressly told that, even if parts were made on existing tooling, parts would still need to be tested and had to meet these standards and specification. HDC was also told that no porosity (i.e., bubbles, holes, or gaps in the cast parts, caused by gas in the tooling) was permitted on machined surfaces.

3. *New Tooling*

Eaton agreed to provide Plaintiff with some spare tooling, owned by Eaton but held by Nebraska Aluminum Castings ("NAC"), one of Eaton's current castings suppliers. By measuring the tooling of the incumbent supplier, or by using it to make raw castings to use as samples, HDC would have an advantage in meeting Eaton's production and quality requirements.

In June 2000, Eaton learned that it needed to get the spare tooling back. As permitted under ¶10.1 of the Sourcing Agreement, Eaton asked that the tooling be returned. HDC accepted this change.

Parties agreed Eaton would purchase new tooling, based on measurement taken from the old tooling, to be held and used by Plaintiff in meeting the Sourcing Agreement. Plaintiff had also built up a reserve of more than 300 raw castings that would let them to move forward with testing the new Okuma machining equipment and would eliminate any delay posed by the return of tooling. After the tooling was returned, Luis Ruiz, the individual employed as third-party quality control expert, stated that it should take about three months to get through qualification on the initial parts, and as little as a year to get to the point where HDC was not only qualified on and supplying parts under the Sourcing Agreement but Eaton was shifting additional work to it.

4. *Significant Delays Prevent Plaintiff From Meeting Its Commitments*

However, Plaintiff was unable to make the new machining equipment work properly. Inability to work with or effectively with Okuma led to significant delays, and it was only in late

October 2000 that the raw castings could be run through the machining process. This initial test, or "run-off" was rejected: the parts were late, HDC was unresponsive on what gauges should be used, and HDC was unable to consistently produce good parts. In addition, it was noted that after being machined these initial parts showed excessive porosity.

Plaintiff had continued problems in meeting its commitments to Eaton. An audit in January 2001 showed that HDC had not made the promised improvements in its facilities and performance: the machinery was idle and Plaintiff had high return and defect rates and problems with its new machining equipment. In March 2001, HDC sent an angry letter to HEMAQ, noting that it was unable to get consistent results with the machining equipment and that it had to invest significant time, expense, and energy to fix things.

Production was also delayed by HDC's inability to get its new die casting tooling made. The die manufacturer it selected held the specifications, plans, and measurements for three months without activity, then moved forward in making the tooling without getting final authorization or review from the Plaintiff.

5.  *Plaintiff's Unresolved Quality Control Issues*

At the same time Plaintiff was trying to resolve these production issues, it was also beginning to produce the sample parts that would be used to qualify it as a supplier. In May 2001, Plaintiff sent five pieces to Eaton for review and approval.

In July 2001, Eaton was told that Plaintiff was ready to begin full production of parts. Eaton issued a 5000 unit purchase order and moved to cancel its relationship with NAC. However, HDC's shipment was three weeks late; because its relationship with NAC was on hold, Eaton was left with no parts for production. At the end of the month, HDC was finally ready to make its shipment of 450 units.

Almost this entire first shipment was rejected. Eaton's inspection revealed the following problems:

- Parts were damaged in shipment;
- Parts showed significant external porosity;
- When sliced open, parts had high internal porosity;
- The bore holes were done incorrectly;
- Parts were discolored due to problems in impregnation treatments mean to protect parts; and
- Parts had problems with the flashing.

By far the most significant problem (which had been discussed in April 2000 and which was the subject of concern during HDC's initial Okuma run-off) was the presence of significant porosity.

Plaintiff acknowledged that it had made a "bad call": Eaton had told it that there should be no porosity, but instead it allowed parts to be produced and shipped with higher levels of porosity. By mid-August, Eaton had provided a full review of this first shipment and was trying to work with HDC to correct the problems.

By mid-September, Eaton had been left waiting for quality parts for more than a month. Plaintiff was aware that its poor performance had left it in jeopardy of losing the contract. In HDC's second and third shipments, approximately one out of every five was rejected, but Plaintiff's improved performance moved Eaton to re-issue the purchase order in late-October 2001 and to allow HDC to send larger shipments. However, by November 19, 2001, Eaton had cancelled the purchase order again based on HDC's continued performance problems.

Plaintiff's next several shipments were accepted without incident. However, in February 2002 a shipment was found to contain a significant number of "leakers," or parts that failed a pressure test. It was later revealed that Plaintiff's leak test had been set up incorrectly and had systematically failed to catch porosity and other defects. By March 2002, an audit showed that Plaintiff's performance was getting worse rather than improving.

In response, Plaintiff apparently put together another "action plan." Plaintiff represented that this action plan would resolve all porosity problems, even though at the time it was explicitly told by Marketwise that earlier plans would have prevented these problems had they been followed.

In June 2002, 733 more parts were rejected by Eaton based on a machining problem. In late July 2002, HDC's defect rate for the year had increased still further and both parties were looking for ways to end the agreement. Marketwise suggests ways that Plaintiff can frame the contract to demand in excess of $1 million in damages if the contract is ended.

On August 21, 2002 Plaintiff issued a termination letter, blaming Eaton for its inability to perform. On the same day, Eaton sent its own letter terminating the Sourcing Agreement and listing its bases for doing so.

B. Controlling Law

Plaintiff's claims are alleged to arise under the Sourcing Agreement signed on March 31, 2000. Parties to a contract are bound by the written terms of their agreement, and where the written terms of the agreement specify particular obligations or rights, the court is to enforce those obligations and rights. McConnell v. Hunt Sports Enterprises, 132 Ohio App. 3d 657, 675 (Ohio Ct. App. 1999). A party may not import additional terms or requirements into an agreement or add words or meanings not stated in the contract itself. Id. at 676.

*1. Parties Obligations Under the Agreement*

Parties duties under the Sourcing Agreement are based primarily on the written terms of the Agreement itself. In carrying out these duties, parties are required under Ohio law to exercise good faith and to observe reasonable commercial standards of fair dealing in the trade. See Ohio Rev. Code §§1301.01(S), 1301.09, 1302(A)(2).

However, a party cannot breach its duty of good faith and fair dealing by enforcing the express terms of the contract. <u>Ed Schory & Sons, Inc. v. Society National Bank</u>, 75 Ohio St. 3d 433, 443 (holding that a party's "decision to enforce the written agreement cannot be considered an act of bad faith"). Ohio law is clear that a party is entitled to the benefit of its negotiated contractual rights, even when those rights may work a hardship on the other party: "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'" <u>Salem v. Central Trust Co.</u>, 102 Ohio App. 3d 672, 678 (Ohio Ct. App. 1995).

To the extent Plaintiff alleges a violation of Eaton's duty of good faith and fair dealing, it may succeed on this allegation only to the extent Eaton's conduct exceeded its contractual rights under the Sourcing Agreement. If Eaton was enforcing a contractual right, even one that created "great discomfort" or hardship for HDC, Plaintiff's claims must fail. <u>Id.</u> If, however, Eaton's actions were permitted under the contract and were commercially reasonably in light of the circumstances, it cannot be liable for termination of the contract.

 2. *Plaintiff's Claim for Breach of Contract*

Plaintiff alleges that Eaton's August 21, 2002 termination of the Sourcing Agreement constituted a breach of the agreement. It is well-established, however, that a material breach by one party discharges the other from further performance on the contract. See <u>Software Clearing House, Inc. v. Intrak, Inc.</u>, 66 Ohiop App. 3d 163, 170 (Ohio Ct. App. 1990); <u>Sun Design Systems, Inc. v. Tirey</u>, No. 95-CA-46, 1996 WL 200619, *3 (Ohio Ct. App. April 19, 1996) (unpublished cases cited herein are attached as Exhibit A).

Eaton's termination of the Sourcing Agreement only constitutes an actionable breach of the contract if Plaintiff was not already in material breach of the Agreement. <u>Id.</u> The "long and

uniformly settled" rule requires only substantial performance to recover on a contract. See Wengerd v. Martin, No. 97CA0046, 1998 WL 225107, *1 (Ohio Ct. App. May 6, 1998) (citing Ohio Farmers Insurance v. Cochran, 104 Ohio St. 427 (Ohio 1922)). However, the doctrine of substantial performance must be "confined to very narrow limits," and although slight omissions and inadvertences should not be considered a breach, courts may fairly impute to a party full knowledge of what a contract requires. Id.; See also Lake Ridge Academy v. Carney, 66 Ohio St. 3d 376, 378 (where contract makes clear a party's obligations, failure to meet those obligations cannot be excused by citing "substantial performance').

HDC may be considered to have been in substantial compliance with the contract—and therefore entitled to recovery on its claims—only if its actions remained within the "very narrow limits" permitted under Ohio law. To the extent HDC failed to comply with the material terms of the Sourcing Agreement, it cannot recover on its contract claims.

3. *Waiver of Contract Rights*

Plaintiff alleges that it was entitled to retain and use the original tooling provided by Eaton. To the extent any such right existed (notwithstanding ¶10.1 of the Sourcing Agreement), Eaton argues that HDC waived any such right. Under Ohio law, a waiver of contract rights is binding where it is done with full knowledge of the circumstances. Frantz v. Van Gunten, 36 Ohio App. 3d 96, 99 (Ohio Ct. App. 1987); See also American Nursing Care of Toledo, Inc. v. Leisure, 609 F. Supp. 419, 429 (N.D. Ohio 1984) (holding that plaintiffs had waived any right to enforce a technical breach of a franchise agreement by continuing to perform under the agreement and in seeking to expand their involvement). Here, if Plaintiff had full knowledge of the circumstances and agreed to continue performing under the contract notwithstanding Eaton's request for return of the tooling, it waived any right to object to the request.

*4.     Repudiation of Sourcing Agreement by Plaintiff*

Under Ohio law, a party may be deemed to have repudiated a contract if it clearly and unequivocally refuses to perform further under the agreement. See Midwest Payment Savings System v. Citibank Federal Savings Bank, 801 F. Supp. 9, 12 (S.D. Ohio 1992); McDonald v. Bedford Datsun, 59 Ohio App.3d 38, 40, 570 N.E.2d 299 (1989).

In the instant case, in August 2002 Plaintiff HDC began to seek ways out of the Sourcing Agreement, and in fact on August 21, 2002 sent a termination letter to Eaton expressly ending the contract. Eaton alleges this was a clear and unequivocal refusal to perform further under the Sourcing Agreement, and therefore HDC cannot recover for Eaton's subsequent failure to perform under the Sourcing Agreement.

*5.     Eaton's Claim for Conversion*

Under Ohio law, conversion consists of the exercise of control over property that is inconsistent with the rights of the true owner or the party having the right of possession.

*6.     Plaintiff's Defense of Frustration of Purpose*

It is unclear this defense is available in this case. As noted in the very case cited by Plaintiff, this is a defense only as to contract claims. See American Premier Underwriters v. Marathon Pipe Line Co., 2002 Ohio 1299 (Ohio Ct. App. 2002). This doctrine therefore provides no defense on Eaton's claims for conversion.

Moreover, the defense does not appear to apply even to contract claims brought under Ohio law. The appellate court in Marathon Pipe notes that the defense has not been accepted under Ohio law and refuses to apply it to the facts before it. Id.; See also Printing Industries Association of Northern Ohio v. International Printing and Graphic Communications Union, 584,

F. Supp. 990, 999-1000 (N.D. Ohio 1984) (noting that frustration of purpose serves as a basis of reforming the contract rather than as a defense, and refusing to apply it to the facts before it).

7.  *Lien Pursuant to Ohio Rev. Code §1333.31*

HDC has also asserted a defense to Eaton's claims based on a lien created in the die casting tooling under Ohio Rev. Code §1333.31. Under that statute, a die caster holds a lien in tooling to the extent that it is owed money either for improvements made in the tooling itself, or for work done with the tooling. Ohio Rev. Code §1333.31. However, the lien arises only to the extent this debt is owed and is therefore not a complete defense on liability. Id.

To find that HDC has properly stated this defense, the Court must find that in fact Eaton owed money either for work done with the tooling or for work done on the tooling. Any recovery to which Eaton is entitled would then be reduced by the amount of that debt.

C.  Evidentiary Issues

On February 21, 2005, Eaton filed three motions in limine which are currently pending before the Court.

The first motion seeks to exclude testimony from Plaintiff's expert that is an unreliable and irrelevant repetition of subjective opinions and positions provided by Plaintiff, without any actual analysis or review of underlying documentation that might undermine these opinions. In the alternative, the motion seeks to exclude any testimony from the expert that is not based on his expertise or special knowledge as an accountant and valuation analyst.

The second motion seeks to exclude testimony or other evidence dealing with relationships between Eaton, Gary Wiseman, and several Mexican companies unrelated to Plaintiff HDC. These relationships arose independently of the Sourcing Agreement between

Eaton and Plaintiff which forms the basis of HDC's claims and are factually unrelated and therefore irrelevant to these claims.

The third motion seeks to exclude testimony and other evidence regarding the performance history of Eaton's other die casting suppliers. There is no evidence that these other die casters were in a similar situation to Plaintiff. Futher, Plaintiff's performance under the Sourcing Agreement, and Eaton's bases for terminating the Agreement, are independent of how other die casting suppliers performed. Such evidence is therefore irrelevant and inadmissible.

If these motions are denied, Eaton may object at trial to the introduction at trial of specific evidence on the grounds stated in these motions. Eaton also reserves the right at trial to the introduction of other testimony or other evidence on the grounds that it is irrelevant, is hearsay, or is otherwise inadmissible.

D.  <u>Witness and Exhibit Lists</u>

Eaton's Proposed List of Witnesses and Proposed List of Exhibits have been served and filed under separate cover.

E.  <u>Proposed Voir Dire Questions</u>

1. Have any of you or any members of your family or close friends ever been terminated?
2. Have you or any of your family members worked for a corporation?
3. Have you or any of your family members owned your own business?
4. Have you or any of your family members worked at a company that has been downsized?
5. Have you or any of your family members worked at a company that has outsourced work?
6. Have you or a family member ever been sued in a contract dispute?
7. Have you or any member of your immediate family worked in the die casting industry?

8. Have you or any member of your immediately family been involved in quality control?

9. Have you or any member of your immediate family ever brought a consumer lawsuit?

10. Have you or any member of your family have any adverse feelings against large corporations?

11. Are you a member of any civic or social groups?

12. Have you or any member of your immediate family purchased or leased an automobile new or used?

13. Have you or any member of your immediate family ever been involved in a suit to collect a debt, either as a plaintiff or a defendant?

14. Have you or any member of your immediate family read articles about downsizing and formed an opinion about it?

15. Have you or any member of your immediate family ever read articles about globalization and outsourcing and formed an opinion about it?

Respectfully submitted,

s/ Mathew Beredo
Jose Feliciano (0024508)
JFeliciano@bakerlaw.com
Mathew B. Beredo (0070160)
Mberedo@bakerlaw.com
BAKER & HOSTETLER LLP
3200 National City Center
Phone: (216) 621-0200
Fax: (216) 479-8780

Attorneys for Defendant
Eaton Corporation

## CERTIFICATE OF SERVICE

A copy of the foregoing was served electronically and by regular U.S. mail upon John E. Schiller, Esq., of Walter & Haverfield LLP, 1301 East Ninth Street, Suite 3500, Cleveland, Ohio 44114-1824, this 25th Day of February, 2005.

        s/ Mathew B. Beredo
        One of the Attorneys for Defendant Eaton Corporation